# Green Mountain Marble Company v. State Highway Board

[296 A.2d 198]

No. 162-71

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed October 3, 1972

*Bloomer & Bloomer,* Rutland, for Plaintiff.

*James M. Jeffords,* Attorney General, and *Richard M. Finn,* Assistant Attorney General, for Defendant.

**Keyser, J.** This plaintiff appealed to the Rutland County Court from the award of the State Highway Board for the taking of 5.8 acres of land for highway purposes by condemnation on September 2, 1966. Trial was by the court which found plaintiff's total damage was $3500. The plaintiff appealed from the judgment which followed.

Numerous issues raised by the appellant are primarily factual being for the most part challenges to the findings of fact made by the trial court which it claims are clearly erroneous. The standard by which such a challenge is tested is stated in 52 V.R.C.P. thus:

> "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses and the weight of the evidence."

The "clearly erroneous" test is similar to that often pronounced by this Court under former 12 V.S.A. § 2385. Cf. *Everlasting Mem. Wks.* v. *Huyck Mon. Wks.,* 128 Vt. 103, 258 A.2d 845 (1969); *Lane Construction Corp.* v. *State,* 128 Vt. 421, 265 A.2d 441 (1970); *Brown* v. *Pilini & Wilson,* 128 Vt. 324, 262 A.2d 479 (1970). And as stated in *Mitchell* v. *Amadon,* 128 Vt. 169, 171, 260 A.2d 213 (1969), it is our duty to take the evidence in the light most favorable to the prevailing party, here the defendant, excluding the effect of any modifying evidence.

The plaintiff is an operating company acquired by Georgia Marble Company of the state of Georgia in 1954. At the time of taking, the appellant's principal outlet of its marble business was government headstone work. It owned property in the southern part of West Rutland consisting of twenty acres. This land was divided into two noncontiguous parcels. On one parcel called "the swamp" Green Mountain owned two quarries called the Mine and Meadow. A third quarry called Ba-

ronial was located on the other parcel containing 12 acres. The Mine quarry was around 300–400 feet from the finishing plant and at the time of taking was the quarry supplying the mill. The Meadow quarry located about 1000 feet from the mill was in the process of development. The Baronial quarry was an "open cut" quarry, forty to fifty feet deep, one hundred feet square and located about one mile from the company's mills and shops. This quarry is the focal point of the controversy.

The appellant claims error on fifteen points which we consider in similar order as briefed.

### Point I

Plaintiff excepted to Finding No. 6 which reads as follows:

"The Baronial Quarry had not been operated since about 1930, and had been filled with water for many years. It was called a reserve by the company, and was thought, probably correctly, to contain some 500,000 cubic feet of recoverable marble or about a four year supply at the then rate of operation. The stone was of good color and might meet some orders then being filled with Mine, Meadow, stone, but it was not close enough to these stones so that it could be intermingled with them. It was primarily a building stone, and the main Green Mountain activity, at the time, was the supplying of government headstones."

The appellant argues that the use of the words "might meet some orders" improperly minimized the substance of the testimony of its witness, Mr. Looney. He was asked whether "any of the marble (shown by cores) in the Baronial area met the specifications of the United States government for headstones." His answer was in the affirmative. His testimony shows that this marble could not be "used interchangeably or substitution-wise" for the marble from either the Mine or Meadow quarries. Baronial marble in color was a shade different, he said, and for this reason could not be mixed with the others but if the entire order was for Baronial marble it could be substituted.

It is apparent that the court used the word "might" in the context that the stone could be used although actually it was

not. This was not because it was of a quality inferior for head-stones. We find no error or prejudice in the finding.

## Point II

Finding No. 13, challenged by the appellant, relates to the finding that there was no demand of Baronial marble for building purposes at the time of taking. At the time of taking the principal activity of the company was supplying government headstones, the stock for which came from its Mine quarry.

Demand refers to a state of being sought after. The lack of demand was amply demonstrated by the trial court in Finding of Fact No. 15. There the lack of demand was illustrated by the disuse of the quarry over 36 years, its abandoned condition, the long period that some blocks of marble quarried years before had remained unused at the quarry site until the time of taking, and the absence of present market demand. Further, the company neither had any plans to use or to reopen the Baronial quarry nor any cost figures for doing so. All of these factors had support in the record and all show a lack of demand.

The testimony about demand was not uncontroverted as appellant suggests. Defendant's witness, McSweeney, testified in this area of there being a lack of demand for Baronial marble.

He also testified that the Baronial mineral deposits did not contribute to the value of the land. His reason for this conclusion was that from a careful and detailed investigation there was no market for Baronial marble. He testified—"I don't care how much stone or how good it is, if you can't sell it, it doesn't increase the value of that property and that stone had gone for at least 35 years without making the slightest effort to remove it except when the Vermont Marble about that time took some out."

Mr. Looney's testimony shows that some blocks which had been left at the Baronial quarry for many years were moved to plaintiff's West Rutland plant about the time of taking and placed in its block storage. "Ultimately it was fabricated into building work and sold," he said, from which it can well be inferred that there was no sale of the marble made before the taking.

This hardly implies a market demand for Baronial marble.

Clearly the issue of demand was controverted and based upon the evidence the, trial judge found no demand. The evidence fairly and reasonably supports the finding.

### Point III

In Finding No. 15, the trial court found that based upon the lack of demand the mineral deposits were not a factor to be considered in the evaluation of the premises. The trial court then found the highest and best use of the premises was residential and went on to value the lands as such.

Appellant also seeks to place this case within the rationale of *Farr* v. *State Highway Board*, 123 Vt. 334, 189 A.2d 542 (1963), the leading case on valuation of mineral deposits here in Vermont. In the *Farr* case the condemnation proceeding involved a portion of a farm in which was located an operating sand pit from which the plaintiffs had sold considerable sand over an extended period of time prior to the taking. The Court, in its discussion of mineral deposits, there stated at 123 Vt. at 337:

> "The deposit *may* be of value and a proper factor to be considered in arriving at the true market worth of the parent property before and after the condemnation. It is equally well settled that such deposits cannot be made the subject of a separate evaluation, apart from the land where it is contained and added to the market value of the land as additional compensation for the taking." (Emphasis added.)

Thus, *Farr* v. *State Highway Board, supra,* stands for the proposition that when there are mineral deposits being used as a source of supply, such deposit may be of value, and is to be considered in arriving at the overall market value.

In appellant's effort to place the case at bar within the rationale of *Farr*, it first attacks the finding that the deposits had no value, and then it attacks the manner in which *Farr* was utilized by the trial court.

A summation of the law as to the conditions necessary to effect an increase in the overall market value of a parcel of property containing mineral deposits is found in 4 P. Nichols, Eminent Domain § 13.22(2) (rev. 3d ed. J. Sackman 1971) as follows:

"The mere physical adaptability of the property to use as a source of supply of a mineral does not, in the absence of evidence of a market for its commercial production, effect an increase in its market value."

Because no evidence of a market for the commercial production of the marble was introduced, other than the one sale of some blocks that had been lying on top of the ground for years, and that the quarry had been out of use 36 years before the taking, the trial court had an ample basis upon which it could find the Baronial quarry had no value. For these reasons the trial court correctly distinguished this case from *Farr*.

In treating the *Farr* case in its Conclusions of Law, the court referred to the phrase "sales over an extended period of time" appearing in the *Farr* opinion. Appellant argues that that statement relates only to the issue of enhancement in *Farr*, and not to evidence of a market. We do not agree. One isolated sale in 1966, the details of which are not in evidence, of the marble which had laid unused for a long time, does not, as plaintiff claims, establish the existence of a market demand for the Baronial marble. The inference is to the contrary as the court found.

It is to be noted that this is not the first time a court has valued lands over a mineral deposit based upon a use other than that of mining the minerals. In *Kelly* v. *State*, 28 A.D.2d 1177, 284 N.Y.S.2d 548 (Sup. Ct. App. Div. 1967), a farm was condemned which had a large gravel deposit close to the dwelling house. The court found the highest and best use of the farm was as an estate farm, and thereafter denied any award for the gravel deposit. Here, plaintiff's exception is without merit.

### Points IV and XI

Appellant's arguments on this issue challenge Finding No. 17 and the trial court's application of *Essex Storage Electric Co., Inc.* v. *Victory Lumber Company*, 93 Vt. 437, 108 A. 426 (1919), in its Conclusion of Law.

Finding No. 17 states:

"As indicated in Finding No. 8, *supra*, we are not of the view that there was any business at the time of taking on the premises which were partially taken."

Similarly, Finding No. 8, not excepted to, reads:

> "At no time since 1930 and *a fortiori* at no time since plaintiff acquired title in 1954, has any business been conducted on the 12 acre parcel from which the area of taken came and on which the Baronial Quarry was located."

Based primarily but not exclusively upon the fact the Baronial Quarry was not used for 36 years and had filled with water, that there was no existing market demand for the Baronial marble, and that the quarry did not enter into the business operations of the company, there appears to be ample evidentiary basis for Finding No. 17.

The appellant claims because there was undisputed evidence of a proven, workable reserve of marble in the quarry that this reserve was a part of the common enterprise of Green Mountain.

▪ In *Essex Storage Electric Co., Inc.* v. *Victory Lumber Company, supra,* 93 Vt. at p. 446, we held:

> "Where two or more pieces of real estate, though separated even by an intervening fee, are used as one enterprise, and constitute fairly necessary and mutually dependent elements thereof, they are in the eye of the law a single parcel, and the taking of one necessitates payment for the injury to the others."

The appellant seeks to show the Baronial quarry bears the same relationship to the Green Mountain operation as did the uncut timber in the *Essex* case. The burden of proof on the question of the use of the lands as a factual issue was also discussed in the *Essex Storage Electric Co., Inc.* v. *Victor Lumber Company, supra,* 93 Vt. at 447, where it is stated:

> "We agree with the contention that the question whether these lands were used as one project is one of fact, and that, being *prima facie* separate parcels, the burden lies on the defendant to establish its claim in its behalf."

Thus, the appellant had the burden under *Essex, supra,* to show as a matter of fact the lands were used as one project, before it could take advantage of the damage formula set

forth in *Essex*. It clearly appears that appellant failed to carry this factual burden.

## Points V and VI

Appellant, in this issue, contests Finding No. 18, which states that it (the court) was not satisfied that a business loss was sustained from the taking.

Quite obviously the trial court would have to have found by a contradictory finding that Green Mountain was transacting business on the lands taken before it could have found a business loss. The trial court, as we have held, properly found no business was conducted on the lands taken. Factual support for the finding is clearly demonstrated by the record, for example, from the use to which the land taken was being put. The weight of the evidence was for the court to decide. V.R.C.P. 52.

Appellant also uses *Record* v. *State Highway Board*, 121 Vt. 230, 154 A.2d 475 (1959), in support of the proposition that the trial court should have considered the "capitalization of income" approach to valuation. This approach is not applicable here since the most reasonable use of the property, as the court found, was for residential purposes, not for business purposes. And further the Baronial quarry was neither used in the business nor did it contribute income to the company's operation. In any event, the application of capitalization of income to measure market value lacks appropriate factual support in the evidence. Here, the appellant is attempting to use the testimony of Mr. Hyatt, a retired executive of Georgia Marble Company, of an operating profit of $186,000. for 1966 on the capitalization of income theory but they are not necessarily the same. Profits from a business can be extremely uncertain, speculative and depend on many contingencies and do not determine the value of land.

The finding goes to the weight of the evidence, and it is not for this Court to disturb the conclusion of the court below on this factual issue.

And the plaintiff argues under its Exception No. VI that the figures arrived at by the court in Finding No. 21 which it uses to demonstrate the fallaciousness of the valuations of Hyatt and Looney were erroneous. However that may be, the

fact still remains that before these figures (or corrected ones, if wrong) could be used the court would have to have found that business was conducted upon the lands taken.

### Points VII and VIII

Green Mountain's next challenge is to Findings Nos. 22 and 23. No. 22 states that plaintiff's witness, Mr. Hyatt, used for his valuation of the company's property after the taking, an offering price for sale by the owner of $750,000. No. 23 finds that the methods Hyatt used in his evaluation would be purely speculative if used as a basis of the court's judgment. He testified the value of Green Mountain before the taking on September 2, 1966, was $1,860,000. as a going business.

The claim is that there is no evidence to support No. 22. To dispose of these exceptions we need only to point to Hyatt's testimony. On being asked in cross-examination where he got the information he relied on to reach his conclusions of the before and after valuations, he answered:

"A    No. 1, $1,860,000 was determined by common sense factor, multiplying the profits for the year 1966 by ten. It is a common and recognized practice and it is a good rule of thumb for evaluating. No. 2, my opinion of the value after the taking was based upon a proposal I understand was made to sell the property for the sum of $750,000.00 after the taking.

Q    I would like to offer it is neither an attempt to reach a value. These are the two figures you rely on?

A    These are the exact figures."

Generally, an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant. *Allen* v. *Burlington Housing Authority*, 129 Vt. 8, 270 A.2d 588 (1970). And opinion testimony does not establish any material fact as a matter of law and is not of controlling effect. *Valente* v. *Commercial Ins. Co. of Newark, N.J.*, 126 Vt. 455, 236 A.2d 241 (1967). Value is at best a matter of opinion and is a factual issue for decision by the court. V.R.C.P. 52.

Appellant seeks to use *Shamrock Oil and Gas Corp.* v. *Coffee*, 140 F.2d 409, 411 (5th Cir. 1944), for the proposition that in

the absence of a market price, value may be a matter of opinion. That case is not applicable here as the appraiser for the state was able to determine a market price based upon the highest and best use of the property as being for residential purposes.

The appellant also seeks to analogize from *Laurent* v. *Vaughn*, 30 Vt. 90 (1858), to arrive at the conclusion that Hyatt's testimony was not speculative. In *Laurent, supra,* the witness, a produce dealer, gave testimony as to the market value of peas based entirely upon information received from others. Here Hyatt was engaged in the manufacture and sale of marble. The finding, No. 23, was based upon the methods of valuation of the property, an expertise quite different from the manufacture and sale of marble. For this reason *Laurent, supra,* is not applicable here. These exceptions are not sustained.

## Point IX

Appellant excepts to Finding No. 27 relating to the evaluation method adopted by Mr. Looney, its engineer. The court stated as it did regarding witness Hyatt's method, that, if used, the evaluation would make any judgment based on this conclusion purely speculative. The claim is that the finding is clearly erroneous for lack of support in the evidence.

A careful scrutiny of the testimony of this witness fails to convince us that the finding is as claimed. The evidence shows the company made a profit in the years 1964, 1965 and 1966. Looney testified on direct examination that the total value of the entire Green Mountain property at the time of taking was $2,300,000. and after the taking it was $1,000,000. These valuations were not based on market data approach, income approach or cost approach or any appraisal technique. However, he did testify in cross-examination—"I did not use the approach Mr. Hyatt used, but I did rely on the fact that it was a profitable division." Reliance on the amount of profits made by the company to determine the value of its property would result in a fluctuating, uncertain and speculative valuation. This method presupposes that all factors which enter into a continued profitable operation would remain constant. The soundness and accuracy of Looney's method is not demonstrated by his testimony.

Thus there is testimony which fairly and reasonably tends to support this finding and it must stand. *State Highway Board* v. *Jackson,* 129 Vt. 288, 297, 276 A.2d 620 (1971). Moreover, it was for the court to judge the credibility of the witness and the weight to be given to his testimony. V.R.C.P. 52.

### Point X

Finding No. 28, in part, is:

> "Further, we cannot find on the evidence presented that the continued availability of the Baronial Quarry would have kept the plaintiff's Green Mountain Division in operation, or that such operation would have resulted in a profit."

The appellant argues it was error for the court not to find on the undisputed testimony of Hyatt and Mr. Perfetti, its retired general manager, that Green Mountain could have continued its operations by using marble from the Baronial quarry had it been available. This testimony is only the opinion of the two witnesses and as such a finding is not mandatory as the plaintiff argues under the ruling in *Mandigo* v. *Mandigo,* 128 Vt. 446, 450, 266 A.2d 434 (1970). It is not demonstrated that use of the marble for the future operation of the company is critically relevant to the controversy. On the evidence presented the finding of the court is without error.

### Point XII

The appellant takes issue with that portion of the court's Conclusion of Law which states that an asking price is never admissible on the question of value. Appellant contends this is erroneous because the trial court relied upon *Penna* v. *State Highway Board,* 122 Vt. 290, 294, 170 A.2d 630 (1961), to support this proposition. In *Penna, supra,* the Court held it was error for the trial court to admit testimony of what a neighbor was asking for his property, admittedly a situation different from that here. In spite of this fact the trial court correctly construed the law on asking price. In 1 L. Orgel, Valuation Under the Law of Eminent Domain § 148 (2d ed. 1953) the law on asking price was summarized as follows:

"Offers to buy or sell property are treated as an inferior type of sales evidence. Their inferiority is attributed partly to the fact that they represent at best the opinion of one party rather than of two and partly to the difficulty of establishing their *bona fide* character. As a rule, therefore, they have been held inadmissible except as admissions against the owner."

The cases cited by appellant in support of the proposition that asking price is admissible as an admission against the owner, are readily distinguishable from the case at bar. Here the asking price was offered on direct, and was not sought to be used as an admission against the owner.

### Point XIII

In its next argument the appellant contends it was error for the court not to consider cases in which the property had no market value because it was seldomly exchanged, or had a special or unique use. These cases are not applicable as they assume there was no readily ascertainable market value for the property. The trial court found otherwise when it found the highest and best use of the premises was for residential use and placed a value of $3500. on it. This claim of reversible error is not sustained.

### Point XIV

By its next exception the appellant challenges the competency of defendant's witness, Frank Davis, to testify as to the value of the Baronial property taken. Appellant also challenges the use of a report by Davis in his evaluation of the highest and best use of the property which was not admitted into evidence.

Appellant's objection to the competency of Davis seems to focus upon the fact that Davis had no knowledge of the sales of quarries. Given the fact Davis testified that based upon the McSweeney report, and upon the sale of similar properties in the area, the highest and best use of this property was for residential uses, it is apparent he was testifying about a type of property in which he had an expertise. Davis' reliance upon the McSweeney report was to use an expert's opinion in an area where he had none. The McSweeney report said the

quarry had no value as a mineral deposit. This was also Mc-Sweeney's testimony. The competency of a witness is a preliminary one for the trial court, and its decision is conclusive unless it appears from the evidence to have been erroneous or founded on an error of law. *Farr* v. *State Highway Board*, 122 Vt. 156, 160, 166 A.2d 187 (1960).

Appellant contends Davis' testimony was based entirely upon hearsay but the record does not bear this out. As appellant himself states, testimony as to value may be based in part on hearsay. See *Gibson* v. *State Highway Board*, 128 Vt. 47, 52, 258 A.2d 810 (1969). And as Mr. Justice Holmes said in *National Bank of Commerce* v. *New Bedford*, 175 Mass. 257, 261, 56 N.E. 288 (1900): "An expert may testify to value although his knowledge of details is chiefly derived from inadmissible sources, because he gives sanction to his general experience." The court properly admitted the testimony of Mr. Davis over plaintiff's objection. The finding is without error.

### Point XV

The plaintiff contends the court abused its discretion by terminating its interrogation of witness McSweeney about the identity of the person who prepared a map, Defendant's Exhibit B. It is not claimed that the court made any use of the exhibit in its findings. Furthermore, the plaintiff has made no argument in this Court of prejudice and our review of the record fails to establish any. As stated in *State Highway Board* v. *Pratt*, 127 Vt. 385, 394, 250 A.2d 726 (1969);

> "It is a well established rule that the party who alleges error has the burden of showing that he has been prejudiced thereby. Otherwise it is presumed to be harmless, if it is error at all."

*U.S.* v. *Stoehr*, 100 F.Supp. 143 (M.D. Pa. 1951), *aff'd.* 196 F.2d 276 (3d Cir. 1952), cited by appellant appears to be readily distinguishable from the situation presented here. This exception is overruled.

We find no reversible error in the trial court and the entry is:

*Judgment affirmed.*